## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No: 0:22-cv-60577

GALA MELTON,

      Plaintiff

                                  **JURY TRIAL DEMANDED**

vs.

EMPLOYBRIDGE SOUTHEAST,
*individually and d/b/a*
PROLOGISTIX,
and RYDER SYSTEM, INC.,

      Defendants.

_____/

### COMPLAINT

Plaintiff, Gala Melton ("**Plaintiff** or "**Melton**"), by her undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendant EmployBridge Southeast, *individually and d/b/a* ProLogistix, ("**ProLogistix**"), and Ryder System, Inc., ("**Ryde**r"), (collectively, "Defendants"), and alleges as follows:

### INTRODUCTION

1.    This case is about a blue-collar employee who was terminated the day she complained about sexual harassment.

2.    Plaintiff Gala Melton seeks damages against Defendants for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("**Title VII**"), and the Florida Civil Rights Act of 1992, §760.01, *et seq.*, Florida Statutes ("**FCRA**").

### JURISDICTION AND VENUE

3.    The Court has jurisdiction over this action under 28 U.S.C. § § 1331 (federal questions), 42 U.S.C. § 2000e-5(f)(3) (Title VII), and §1367 (supplemental jurisdiction).

4.      Venue is proper in the Southern District of Florida under 42 U.S.C. § 20003-5(f)(3) and 28 U.S.C. § 1391(b) because a substantial portion of the acts or omissions giving rise to this action occurred in the Southern District of Florida.

## PARTIES

5.      Plaintiff Gala Melton is an individual residing in Miami-Dade County, Florida.

6.      Plaintiff is a "person" within FCRA section 760.02(6) and Title VII.

7.      Defendant Employbridge Southeast, LLC individually and d/b/a ProLogistix is a foreign limited liability company, with a principal address at 1040 Crown Pointe Parkway, Suite 1040 Atlanta, GA 30338, and a Florida location at 2248 NW 87th Ave, Miami, FL 33172.

8.      ProLogistix is an "employer" within the meaning of FCRA section 760.02(7) because Defendant employed 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year and a "covered entity" within 42 U.S.C. § 12111(a) and 42 U.S.C. § 12111(2).

9.      Defendant Ryder System Inc. is a Florida profit corporation with a principal address at 11690 NW 105 St., Miami, FL 33178, and a location at 19700 Stirling Road, Southwest Ranches, FL 33331, known, upon information and belief, as "Ryder Ross," where the actions giving rise to this action occurred.

10.      Defendant Ryder is an "employer" within the meaning of FCRA section 760.02(7) because Defendant employed 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year 42 U.S.C. §2000e(b) and 42 U.S.C. § 12111(5)(A) and a "covered entity" within 42 U.S.C. § 12111(a) and 42 U.S.C. § 12111(2).

11.     Plaintiff was jointly employed by ProLogistix and Ryder.  Ryder and ProLogistix were highly integrated with respect to ownership, operations and management at the Ryder Ross location on Stirling Road, which was owned and operated by Ryder System Inc.

## ADMINISTRATIVE PREREQUISITES

12.     Plaintiff has complied with all administrative requirements.

13.     On or about July 2, 2021, Plaintiff timely dual-filed charges of discrimination (Charge No. 510-2021-0529; 510-2021-05264) with the U.S. Equal Employment Opportunity Commission ("**EEOC**"), and the Florida Commission on Human Relations ("**FCHR**"), naming Employbridge, LLC and Ryder System, Inc. as the Respondents.

14.     On or about February 18, 2022, the EEOC issued a right to sue notice.

15.     On or about March 18, 2022, Plaintiff timely commenced this action within 90 days of the EEOC's notice of her suit rights.

## FACTUAL ALLEGATIONS

16.     Plaintiff, Gala Melton is a 55-year-old woman.

17.     On or about April 2, 2021, ProLogistix hired Melton as a "Warehouse Associate," and assigned her to Ryder's warehouse distribution center at Stirling Road.  Plaintiff's job responsibilities included checking, packing, transporting, and marking boxes for shipment, in addition to miscellaneous duties, like sweeping the warehouse floor.

### ProLogistix and Ryder Supervisors Subject Plaintiff to Sexual Harassment

18.     On or about April 2, 2021, Melton arrived at Ryder's Stirling Road Warehouse promptly at 9 A.M. for her first day.

19.     As a new employee, Melton attended an orientation headed by Ryder and ProLogistix personnel until about 10:30 A.M.  The training was with respect to Ryder and

ProLogistix employment policies that controlled Melton's work at Ryder Ross's distribution center, including a sexual harassment and employment discrimination training.

20.     Afterwards, Plaintiff approached the operations control center to ask Mr. Demetri Chinn ("**Chinn**"), Ryder's "Warehouse Manager," whether she had downloaded the correct smartphone app to track her hours.

21.     Melton showed Chinn her phone and confirmed that she downloaded the correct app.  Then, however, after seeing Melton's lock screen, a photo of Melton, Chinn said, "Ooooh, let me see that again?"  Melton said, "Excuse me?"  She put her phone in her pocket and hurried away from Chinn, offended.  Later—after Melton had complained of sexual harassment regarding the events forthcoming—Defendants corroborated this allegation and terminated her thereafter.

22.     Mr. Bobby Ross ("**Ross**") is a "shift lead" for ProLogistix, at Ryder's Stirling Road Warehouse, and was Melton's direct report, holding supervisory over Melton.

23.     Chinn told Ross that Melton had shown him a "picture of her ass."

24.     Ross began sexually harassing Plaintiff minutes after she reported to the warehouse floor.  At first, Ross approached Melton and said, "You're beautiful."  While Plaintiff was taken aback, she was shocked that her supervisor would say such a thing to her.  On another occasion, Ross came up to Melton and said, "Damn, you're fine." Later that day, while Plaintiff was sweeping the warehouse floor, Ross came up to her and said, "Your ass is unbelievable."  The he asked, "Is your ass completely real?"  Ross said, "Are you sure it's real?"

25.     Later in the afternoon of or about April 2, 2021 Ross approached Melton and said, "You're beautiful and I want to have sex with you."  Melton, disgusted, continued sweeping, doing her best to move away from Ross.  It did not work.  Ross followed her and said, "What's your phone number."  Melton said, "You're not getting it."  Still, he would not quit.  Ross said, "Do

you have a husband?"  Melton said she did, hoping Ross would stop.  Ross insisted, saying, "What would it take to spend time with me?"

26.    Plaintiff went home that day perplexed at what she had experienced.  While she was excited for a new opportunity, the presence of two harassing supervisors made her uneasy. To be sure, Melton opposed and was extremely offended by both Ross and Chinn.

27.    On or about April 4, 2021, Easter Sunday, Ross resumed his harassment of Melton. Plaintiff was working at the front of the operation control center station.  Ross approached Melton's work area and questioned whether she was really married.  "I want to get you know you better," Ross said.  "Would you like to go out?  Where do you like to eat?"  Ross said, "I want to go to bed with you.  I'll do whatever it takes."  Melton said, "No.  I'm not interested.  Period."

28.    Melton, offended, only thought about how inappropriate it was for her immediate supervisor to continue to make these unwanted sexual advances. She started looking around the warehouse, hoping that security cameras caught these rampant approaches.

29.    On or about April 6, 2021, Ross approached Plaintiff.  He said, "I want you to take down my phone numbers, but I don't want anyone to see me giving them to you."  Melton said, "I don't want your phone number."  Ross said, "Why not."  Plaintiff then made clear that she was not interested in having a sexual relationship with Ross.  She said, "I have a husband who I'm very much in love with.  I'm 55-years-old, and I have never been involved with anyone else, and I don't plan to start now."

30.    Ross obtained Melton's phone number from Chinn, and called Melton later that afternoon called Melton.  Ross said, "I want to be with you sexually."  Melton did not know who it was at first.  "Who is this?"  He said, "It's me, Bobby."  Melton said, "How'd you get my number."  Ross said, "I have access to anything I want here."  He said, "Do you live with someone

or do you live alone?" He asked Melton if she had a phone video app. Ross said, "Because I want to see you on video." Melton, offended, said, "No!" Melton was extremely uncomfortable. She attempted to change the subject and asked about advancing in the company. Then Melton said, "Thanks, but I have to go. I have a long drive home, and I'm working early in the morning."

31.     At around 5:50 P.M., Ross sent Plaintiff a link to do a video chat via "Duo," saying "Bless me!!" referring to his request to watch Plaintiff on video, naked in the shower.



32.     Ross said, "Can I watch you taking a shower naked?" Melton immediately hung up. Ross called back. Melton said, "Please, leave me alone—stop calling me." Ross would not. Indeed, when Melton arrived home, he called once again via video. Melton answered to say, "Please—leave me the hell alone!" Ross was laying down on his bed, in the dark. He said, "Please, I like you and I just want to see you naked while you shower." Melton screamed. She said, "I'm not a whore. Don't ever call me again." Plaintiff hung up and immediately blocked Ross's number. Melton was disgusted. She began crying, knowing Ross intended to masturbate while he watched her.

33.     On or about April 7, 2021, Ross saw Melton in her car pulling into the parking lot. He ran to her car and said, "Please, don't say anything to anyone.  I'm sorry, please forgive me."

34.     One of Defendants' employees, a young girl (name unknown) approached Melton. The young girl came through the Ryder staff entrance, where she had been conversing with Ryder supervisors. She asked Melton how long she had been there for.  Melton said she had just arrived. Then the girl said, "What time did you get out of here last night?"  Melton said, "After my shift— about 8 P.M." Then the girl went back to where the supervisors were standing.  She approached Ross and another Ryder employee.

35.     Then the girl said, "Ms. Gala, can I tell you something about Bobby?  The other day, when we were on break, he grabbed my clothing and said, 'You're pretty, I wanna take you home in my bed.'" Melton said, "Stay away from that pervert." The young girl then walked away and approached Ross and another employee. The young girl then came back and told Melton, "Bobby said you can't call him a pervert because you've been showing everyone pictures of your naked ass."

**Plaintiff Reports Harasser to Ryder and ProLogistix Supervisors**

36.     On or about April 7, 2021, Melton complained to three different Ryder and ProLogistix supervisors about Ross's sexual harassment.  Melton told the young girl she was going to report Ross. Melton said, "I'm gonna go report this to the office." "No," the young girl said, "don't do that." "I'm not here to play games," Melton said.  "This is how I pay my bills.  I'm not gonna fool around with this opportunity."

37.     Melton then complained to an unknown supervisor, who upon information and belief worked for Ryder (and was pregnant at time).  The supervisor said, "Oh, don't worry about it.  Bobby says that stuff to everyone." Melton said, "I can't ignore that, it offends me.  I'm going

to complain to the main office." The supervisor stopped Melton and said, "Go report it to that guy over there. The one on the forklift."

38.    Melton approached the forklift operator. She said, "Excuse me, may I speak with you?" The forklift operator looked surprised but allowed Melton to continue. She said, "From day one I've been putting up with Ross. He's disrespectful. He makes sexual comments about me. Now he's telling this young girl that I was showing pictures of my naked behind to everyone." Melton paused and said, "Look. I want nothing to do with this. I would like to speak to someone in management." The forklift operator had no idea what Melton was saying. He said, "I know nothing about this." Melton then realized the supervisor had misdirected her.

39.    At that point the young girl approached Melton and said, "Hey, don't worry about this. Just leave it alone." Melton said, "No, I'm not gonna leave it alone."

40.    Melton then went outside where Ilianiz Rodriguez ("Rodriguez"), ProLogistix's "Staff Performance Manager." Rodriguez was at a tent for new employees. Melton said, "I need to talk to you. Is Sue here?' Rodriguez said, "No." Melton said, "Look, I'm being sexually harassed by Bobby."

41.    Plaintiff had Rodriguez's attention, and Plaintiff believed Ross would be stopped once and for all. She asked her to go in a private room. Melton reported and opposed all sexual harassment allegations detailed herein. Afterwards, Rodriguez said, "Let me go get the head man from Ryder. Stay right here. I'll be right back." While unclear who the "head man from Ryder" was, Rodriguez's first course of action was to address a sexual harassment allegation with a Ryder executive Melton then waited for about 15 minutes. Nothing happened.

42.     Melton went back onto the warehouse floor to get her purse because she needed her glasses.  She saw Rodriguez, the Forklift operator and another supervisor huddled.   Rodriguez approached Melton and said, "Why are you not in the office?"

43.     Rodriguez then said, "I need you to punch out."  Plaintiff said, "Why are you sending me home?  I didn't do anything."  Rodriguez stared at Melton while her supervisors looked on.  Melton said, "I didn't do anything.  Bobby's cause of all this.  What am I supposed to do?  I come all the way from Miami, I get sexually harassed, try to do something about it and now you're sending me home?"

44.     Rodriguez repeated herself.  She said, "I need you to punch out." Melton had no choice but to accept.  She said, "Ok, I'll go clock out." Rodriguez said, "No, I'll do it for you.  I need you to go home now.  I'm gonna review the tapes if not today, then first thing tomorrow." Melton said, "What are you looking for?  He's been harassing me since day one."  Rodriguez said, "We're gonna see if it's on tape you showing [Chinn] picture of your ass."  Melton said, "OK, well the tape will show I never did that."

### Defendants Terminate Plaintiff Because She Reported Sexual Harassment

45.     On or about April 8, 2021, at or around 9:45 A.M., Plaintiff spoke with "Ms. Jackie" (who only gave her first name) from ProLogistix's Doral location.

46.     Plaintiff explained her entire story to Ms. Jackie.  During the call, Ms. Jackie placed Melton on hold about 3-4 times, attempting to call Rodriguez and another individual, the "Head On-Site Ryder-Ross Supervisor."  However, neither of Defendants' representatives answered.  Ms. Jackie said, "I emailed and left both of them messages to return my calls as soon as possible."

47.     Melton called Rodriguez multiple times between about 10:00 A.M. and 12:30 P.M., with no response.  Finally, at around 1 P.M., Rodriguez called Plaintiff.  She said, "We reviewed

the tapes and saw Ross coming up to you all those times.  And that you never showed a picture to [Chinn]."  Melton said, "OK, well then am I allowed to come back to work?"  Rodriguez said, "Unfortunately, you are not allowed to come back here."

48.     Rodriguez called Melton and said she would contact Angie Young ("**Young**"), ProLogistix's "Administrative Assistant" at its Doral location.

49.     At the Doral location, Garcia said, "I'm gonna make sure nothing else happens again with Ross."  Then she said, "Do you have any proof of this?"  Garcia said, "Can you prove that Bobby texted you?"  Melton said, "I wanted to know if you have a job here. [Rodriguez] said she was sending me here because she said there was work here."  Garcia said, "Unfortunately, there's no work for you here."  Melton was dumbfounded.  She said, "But I came here because I thought there was work."  Garcia said, "No, there's no work.  [Rodriguez] just wanted me to get your story."

50.     On or about April 8, 2021 Defendants unlawfully terminated Melton because she complained and opposed sexual harassment.

51.     Melton hurried to her car and began crying hysterically.  She called her adopted mother and told her what happened.  Overwhelmed by the harassment and the intense efforts to blame her for Ross's unrelenting harassment, Melton contemplating killing herself.  Indeed, as she was driving home, she thought about driving her car off of Sheridan street into a light pole.

52.     Ryder nor ProLogistix followed their own sexual harassment policies to the extent they do in fact exist.  Plaintiff was further shocked by the fact that Defendants not only failed to properly investigate the matter, but instead, did everything in their power to sweep the issue under the rug, out of sight of Defendants' corporate headquarters.

53.     The above are just some of the examples of unlawful discrimination and retaliation Defendants subjected Plaintiff to on a continuous and on-going basis throughout her employment.

54.     Defendants unlawfully discriminated against Plaintiff because of her sex and because she opposed and complained about Defendants' unlawful employment practices perpetrated against Plaintiff because of her sex.

55.     Defendants unlawfully terminated Melton because of her sex and because she opposed and complained about Defendants' unlawful employment practices.

56.     Indeed, Plaintiff complained on April 7, 2021, and Defendants terminated Melton on April 8, 2021.

57.     Defendants should be punished for its willful and knowing discriminatory employment practices directed at Plaintiff.  Defendants are liable for violating Plaintiff's personal dignity, and depriving Plaintiff of her civil right to pursue an equal employment opportunity.

## CAUSES OF ACTION

### COUNT I
### Title VII, 42 U.S.C § 2000e-2(a)
### Hostile Work Environment – Sex
### (Against all Defendants)

58.     Plaintiff reincorporates the allegations in paragraphs 16-44.

59.     Defendants violated Title VII by intentionally discriminating against Plaintiff because of her sex, and by subjecting Plaintiff to relentless verbal abuse and humiliation because of her sex.

60.     The conduct described throughout this complaint and described below had the purpose or effect of unreasonably interfering with Plaintiff's work performance, or otherwise created an intimidating, hostile or offensive environment because of her sex.

61.     Plaintiff is a woman and therefore is a member of a protected class.

62.     Plaintiff was subjected to unwelcome, humiliating harassment and abuse because of her sex, and Defendants failed to take corrective action to prevent same.

63.     Plaintiff showed Chinn her phone and confirmed that she downloaded the correct app.   Then, however, after seeing Plaintiff's lock screen—a revealing "selfie"—Chinn said, "Ooooh, let me see that again?"  Plaintiff, offended, said, "Excuse me?"  and immediately walked away from Demetrius.  Chinn then told Ross, Plaintiff's other supervisor, that she had shown a picture of her body to him.

64.     Ross made unwanted sexual advances towards Plaintiff over her repeated objection. For instance, he approached Plaintiff and said things like, "Your ass is unbelievable" or, "Is your ass completely real?"  Then he approached Plaintiff and said, "You're beautiful and I want to have sex with you," and "What would it take to spend time with me?"  On or about April 4, 2021— Easter Sunday—Ross approached Plaintiff at work and said, "I want to go to bed with you.  I'll do whatever it takes."

65.     Plaintiff made clear she was offended by these sexual advances.  For example, Plaintiff said, "No. I'm not interested.  Period."   Then, on or about April 6, 2021, Ross said, "I want you to take down my phone numbers, but I don't want anyone to see me giving them to you." Plaintiff said, "I don't want your phone number."  Ross ignored her, called that afternoon, and said, "I want to be with you sexually."  Ross asked Plaintiff if she would video chat with him "Because I want to see you on video."  Plaintiff, offended, said, "No!"  Ross said, "Can I watch you taking a shower naked?"  Plaintiff hung up.  Ross called back again on the video application. Plaintiff said, "Please—leave me the hell alone!"  Ross, who was laying on his bed in the dark, said, "Please, I like you and I just want to see you naked while take a shower."  Plaintiff said, "I'm not a whore.  Don't ever call me again," and then hung up the phone.

66.     Plaintiff was humiliated and under extreme distress.  She began crying.  She knew Ross's intentions were to watch her for his sexual gratification.  Ultimately, Plaintiff wanted to kill herself following her employment with Defendants.

67.     Moreover, the harassment was sufficiently severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.  As an initial matter, Plaintiff perceived the harassment as subjectively offensive because she complained about sexual harassment on multiple occasions and filed a charge of discrimination with the EEOC.  Any reasonable person in Plaintiff's position would likewise adjudge the above-described harassment as severe and/or pervasive because such conduct was frequent and humiliating, and unreasonably interfered with Plaintiff's job performance.  To be sure, these sexual advances were pervasive because Plaintiff had to stave off unwanted sexual advances every day of her employment.

68.     Defendants failed to take any corrective action upon actual notice of Plaintiff's complaints.  For example, a Ryder supervisor told Plaintiff "Oh, don't worry about it, Bobby says that stuff to everyone." after Plaintiff described the above.  That supervisor then failed to take any action, and instead directed her to a Ryder supervisor on a forklift who said, "I know nothing about this."   Plaintiff then provided notice to Rodriguez, who told Plaintiff she was going to get the "head man at Ryder," yet never took any action.

69.     Taken together, construed in the light most favorable to Plaintiff, the above gives rise to the plausible inference that Defendants violated Title VII by discriminating against Plaintiff because of her sex.

70.     As an actual and proximate result of the Defendants' unlawful employment practices in violation of the Title VII, Plaintiff has suffered damages.

<u>**COUNT II**</u>
**FCRA § 760.10(1)(a)**
**Hostile Work Environment – Sex**
<u>**(Against all Defendants)**</u>

71.      Plaintiff reincorporates the allegations in paragraphs 16-44.

72.      Defendants violated FCRA § 760.10(1)(a) by intentionally discriminating against Plaintiff because of her sex, and by subjecting Plaintiff to relentless unwanted sexual advances and humiliation because of her sex.

73.      The conduct described throughout this complaint and described below had the purpose or effect of unreasonably interfering with Plaintiff's work performance, or otherwise created an intimidating, hostile or offensive environment because of her sex.

74.      Plaintiff is a woman and therefore is a member of a protected class.

75.      Plaintiff was subjected to unwelcome, humiliating harassment and abuse because of her sex, and Defendants failed to take corrective action to prevent same.

76.      Plaintiff showed Chinn her phone and confirmed that she downloaded the correct app.  Then, however, after seeing Plaintiff's lock screen—a revealing "selfie"—Chinn said, "Ooooh, let me see that again?"  Plaintiff, offended, said, "Excuse me?"  and immediately walked away from Demetrius.  Chinn then told Ross, Plaintiff's other supervisor, that she had shown a picture of her body to him.

77.      Ross made unwanted sexual advances towards Plaintiff over her repeated objection.  For instance, he approached Plaintiff and said things like, "Your ass is unbelievable" or, "Is your ass completely real?"  Then he approached Plaintiff and said, "You're beautiful and I want to have sex with you," and "What would it take to spend time with me?"  On or about April 4, 2021—Easter Sunday—Ross approached Plaintiff at work and said, "I want to go to bed with you.  I'll do whatever it takes."

78.     Plaintiff made clear she was offended by these sexual advances.  For example, Plaintiff said, "No. I'm not interested.  Period."   Then, on or about April 6, 2021, Ross said, "I want you to take down my phone numbers, but I don't want anyone to see me giving them to you." Plaintiff said, "I don't want your phone number."   Ross ignored her, called that afternoon, and said, "I want to be with you sexually."  Ross asked Plaintiff if she would video chat with him "Because I want to see you on video."  Plaintiff, offended, said, "No!"  Ross said, "Can I watch you taking a shower naked?"  Plaintiff hung up.  Ross called back again on the video application. Plaintiff said, "Please—leave me the hell alone!"  Ross, who was laying on his bed in the dark, said, "Please, I like you and I just want to see you naked while take a shower."  Plaintiff said, "I'm not a whore.  Don't ever call me again," and then hung up the phone.

79.     Plaintiff was humiliated and under extreme distress.  She began crying.  She knew Ross's intentions were to watch her for his sexual gratification.  Ultimately, Plaintiff wanted to kill herself following her employment with Defendants.

80.     Moreover, the harassment was sufficiently severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.  As an initial matter, Plaintiff perceived the harassment as subjectively offensive because she complained about sexual harassment on multiple occasions and filed a charge of discrimination with the EEOC.  Any reasonable person in Plaintiff's position would likewise adjudge the above-described harassment as severe and/or pervasive because such conduct was frequent and humiliating, and unreasonably interfered with Plaintiff's job performance.  To be sure, these sexual advances were pervasive because Plaintiff had to stave off unwanted sexual advances every day of her employment.

81.     Defendants failed to take any corrective action upon actual notice of Plaintiff's complaints.  For example, a Ryder supervisor told Plaintiff "Oh, don't worry about it, Bobby says

that stuff to everyone." after Plaintiff described the above.  That supervisor then failed to take any

action, and instead directed her to a Ryder supervisor on a forklift who said, "I know nothing about

this."   Plaintiff then provided notice to Rodriguez, who told Plaintiff she was going to get the

"head man at Ryder," yet never took any action.

82.     Taken together, construed in the light most favorable to Plaintiff, the above gives

rise to the plausible inference that Defendants violated the FCRA by discriminating against

Plaintiff because of her sex.

83.     As an actual and proximate result of the Defendants' unlawful employment

practices in violation of the FCRA, Plaintiff has suffered damages.

**COUNT III**
**Title VII, 42 U.S.C. § 2000e-3(a)**
**Retaliation**
**(Against all Defendants)**

84.     Plaintiff reincorporates the allegations in paragraphs 36-57.

85.     Defendants violated Title VII's anti-retaliation provision by discriminating against

Plaintiff because she opposed sexual harassment.

86.     Plaintiff engaged in protected activity on or about Aril 7, 2021, by complaining to

three different supervisors regarding Ross's persistent unwanted sexual advances. Plaintiff

complained to a supervisor who was pregnant at the time (name unknown).  Plaintiff complained

to a forklift supervisor.  Plaintiff said, "Ross has been sexually harassing me."  Plaintiff engaged

in further protected activity by complaining to the forklift operator she was misdirected to.

Plaintiff then complained to Rodriguez, and said, "From day one I've been putting up with Bobby.

He's disrespectful.  He makes sexual comments about me."

87.     Plaintiff suffered materially adverse actions because any reasonable worker well

might be dissuaded about opposing and/or supporting a charge of discrimination if the employee

knew her supervisors would tell her "not to worry about" harassment because the harasser "says that stuff to everyone"; if the employee knew a supervisor would take zero action and misdirect the employee to a random forklift operator; if the employee knew that after she complained about sexual harassment to her hiring supervisor, and after the latter spoke with the "head man" of the company, the supervisor would say, "I need you to punch out," repeatedly; and any reasonably worker well might be dissuaded about opposing and/or supporting a charge of discrimination if the employee knew her employer would terminate her employment as a result of her repeated sexual harassment complaints.

88.     These materially adverse actions are causally connected to Plaintiff's protected activity based on temporal proximity and because Plaintiff's sexual harassment complaints and subsequent adverse actions are not wholly unrelated.

89.     Indeed, Defendants were aware of Plaintiff's complaints about sexual harassment and took the above-described materially adverse actions because Plaintiff engaged in protected activity.  To be sure, Defendants would not have taken the above-described materially adverse actions but-for her complaints about sexual harassment.  Likewise, the decisionmakers had actual knowledge of Plaintiff's discrimination complaints because Plaintiff complained to them directly, and took the materially adverse actions against Plaintiff immediately.

90.     These allegations give rise to the plausible inference that Defendants retaliated against Plaintiff in violation of Title VII.

91.     As an actual and proximate result of the Defendants' unlawful employment practices in violation of Title VII, Plaintiff has suffered damages.

**COUNT IV**
**FCRA § 760.10(7)**
**Retaliation**
**(Against all Defendants)**

92.     Plaintiff reincorporates the allegations in paragraphs 36-57.

93.     Defendants violated the FCRA's anti-retaliation provision by discriminating against Plaintiff because she opposed sexual harassment.

94.     Plaintiff engaged in protected activity on or about Aril 7, 2021, by complaining to three different supervisors regarding Ross's persistent unwanted sexual advances. Plaintiff complained to a supervisor who was pregnant at the time (name unknown). Plaintiff complained to a forklift supervisor. Plaintiff said, "Ross has been sexually harassing me." Plaintiff engaged in further protected activity by complaining to the forklift operator she was misdirected to. Plaintiff then complained to Rodriguez, and said, "From day one I've been putting up with Bobby. He's disrespectful. He makes sexual comments about me."

95.     Plaintiff suffered materially adverse actions because any reasonable worker well might be dissuaded about opposing and/or supporting a charge of discrimination if the employee knew her supervisors would tell her "not to worry about" harassment because the harasser "says that stuff to everyone"; if the employee knew a supervisor would take zero action and misdirect the employee to a random forklift operator; if the employee knew that after she complained about sexual harassment to her hiring supervisor, and after the latter spoke with the "head man" of the company, the supervisor would say, "I need you to punch out," repeatedly; and any reasonably worker well might be dissuaded about opposing and/or supporting a charge of discrimination if the employee knew her employer would terminate her employment as a result of her repeated sexual harassment complaints.

96.     These materially adverse actions are causally connected to Plaintiff's protected activity based on temporal proximity and because Plaintiff's sexual harassment complaints and subsequent adverse actions are not wholly unrelated.

97.     Indeed, Defendants were aware of Plaintiff's complaints about sexual harassment and took the above-described materially adverse actions because Plaintiff engaged in protected activity.  To be sure, Defendants would not have taken the above-described materially adverse actions but-for her complaints about sexual harassment.  Likewise, the decisionmakers had actual knowledge of Plaintiff's discrimination complaints because Plaintiff complained to them directly, and took the materially adverse actions against Plaintiff immediately.

98.     These allegations give rise to the reasonable inference that the Company retaliated against Plaintiff in violation of FCRA § 760.10(7).

99.     As a result of Defendants' unlawful retaliation, Plaintiff has suffered damages.

**COUNT V**
**Title VII, 42 U.S.C. § 2000e-3(a)**
**Retaliatory Hostile Work Environment**
**(Against all Defendants)**

100.    Plaintiff reincorporates the allegations in paragraphs 17-57.

101.    Alternatively, Defendants subjected Plaintiff to a retaliatory hostile work environment because she engaged in protected activity by taking actions that well might dissuade a reasonable worker from making or supporting a charge of discrimination.

102.    Plaintiff engaged in protected activity by complaining to Ross directly that she was not interested in having a sexual relationship with him under any circumstance.  Likewise, Plaintiff engaged in protected activity by reporting Ross to multiple ProLogistix and Ryder supervisors.

103.    Specifically, Plaintiff repeatedly told Ross she opposed his unwanted sexual advances.  On April 4, 2021—Easter Sunday—Plaintiff told Ross, "I'm not interested.  Period,"

after Ross told Plaintiff, "I want to go to bed with you.  I'll do whatever it takes."  On or about April 6, 2021, Ross said, "I want you to take down my phone number, but I don't want anyone to see me giving them to you."  Plaintiff said, "I don't want your phone number."  Ross called Plaintiff and said, "I want to be with you sexually."  Ross asked Plaintiff if she would video chat with him.  He said, "Because I want to see you on video."  Melton, offended, said, "No!"  Ross sent Plaintiff a link to do a video chat via "Duo."  Ross said, "Can I watch you taking a shower naked?"  Plaintiff hung up.  Ross called back again on the video application.  Plaintiff said, "Please—leave me the hell alone!"  Ross said, "Please, I like you and I just want to see you naked while take a shower."  Plaintiff said, "I'm not a whore.  Don't ever call me again."

104.    The above-described actions are materially adverse because any reasonable worker would be dissuaded about complaining of sexual harassment if she knew she would be subjected to repeated unwanted sexual advances because she engaged in such activity.

105.    Plaintiff's protected activity and the subsequent unwanted sexual advances are causally connected because Plaintiff told Ross she was uninterested in sexual activity with him, and he immediately persisted making advances to same.

106.    Plaintiff engaged in further protected activity by complaining about Ross's harassment to multiple ProLogistix and Ryder supervisors who failed to take any corrective action, and victimized Plaintiff.  The first supervisor told Plaintiff, "Oh, don't worry about it.  Bobby says that stuff to everyone."  The supervisor then re-directed Plaintiff to a forklift operator.

107.    Plaintiff suffered  materially adverse because any reasonable worker well might be dissuaded about opposing and/or supporting a charge of discrimination if the employee knew her supervisors would tell her "not to worry about" harassment because the harasser "says that stuff to everyone"; or, if the employee knew a supervisor would take zero action and misdirect the

Case 0:22-cv-60577-XXXX   Document 1   Entered on FLSD Docket 03/18/2022   Page 21 of 26

employee to a random forklift operator; or, if the employee knew that after she complained about sexual harassment to her hiring supervisor, and after the latter spoke with the "head man" of the company, the hiring supervisor said, "I need you to punch out," repeatedly, doubling-down even after the employee said, "I get sexually harassed, try to do something about it, and now you're sending me home"; and any reasonably worker well might be dissuaded about opposing and/or supporting a charge of discrimination if she knew her employer would terminate her employment as a result of her repeated sexual harassment complaints.

108.    Taken together, these allegations are sufficient to give rise to the plausible inference that Defendants subjected Plaintiff to a retaliatory hostile work environment.

109.    As an actual and proximate result of Defendants' unlawful retaliation in violation of Title VII, Plaintiff has suffered damages.

<u>**COUNT VI**</u>
**FCRA, § 760.10(7)**
**Retaliatory Hostile Work Environment**
(<u>**Against all Defendants**</u>)

110.    Plaintiff reincorporates the allegations in paragraphs 17-57.

111.    Alternatively, Defendants subjected Plaintiff to a retaliatory hostile work environment.

112.    Plaintiff engaged in protected activity by complaining to Ross directly that she was not interested in having a sexual relationship with him under any circumstance.

113.    Plaintiff suffered materially adverse actions because she engaged in the above protected activity.

114.    Specifically, Ross insisted on making unwanted sexual advances after Plaintiff told him she was not interested, repeatedly. on or about April 4, 2021—Easter Sunday—Ross approached Plaintiff at work and said, "I want to go to bed with you.  I'll do whatever it takes."

Plaintiff said, "No. I'm not interested.  Period."  Nonetheless, Ross persisted.  On or about April 6, 2021, Ross said, "I want you to take down my phone numbers, but I don't want anyone to see me giving them to you."  Plaintiff said, "I don't want your phone number."  Ross said, "Why not." Later that afternoon, Ross called Plaintiff and said, "I want to be with you sexually."  Ross asked Plaintiff if she would video chat with him.  He said, "Because I want to see you on video." Plaintiff, offended, said, "No!"

115.    At around 5:50 P.M., Ross sent Plaintiff a link to do a video chat via "Duo."  Ross said, "Can I watch you taking a shower naked?"  Plaintiff hung up.  Ross called back again on the video application.  Plaintiff said, "Please—leave me the hell alone!"  Ross, who was laying on his bed in the dark, said, "Please, I like you and I just want to see you naked while take a shower." Plaintiff said, "I'm not a whore.  Don't ever call me again," and then hung up the phone.

116.    The above-described actions are materially adverse because any reasonable worker would be dissuaded about complaining of sexual harassment if she knew she would be subjected to repeated unwanted sexual advances because she engaged in such activity.

117.    Plaintiff's protected activity and the subsequent unwanted sexual advances are causally connected because Plaintiff told Ross she was uninterested in sexual activity with him, and he immediately persisted making advances to same.

118.    Plaintiff engaged in further protected activity by complaining about Ross's harassment to multiple Prologistix and Ryder supervisors who failed to take any corrective action, and victimized Plaintiff, telling her she "could leave," and that there was "no work for you," after she complained about Ross's harassment.

119.     Any reasonable employee in Plaintiff's prospective well might be dissuaded about complaining of sexual harassment if she knew she would be subjected to same because she reported sexual harassment.

120.     Taken together, these allegations are sufficient to give rise to the plausible inference that Defendants subjected Plaintiff to a retaliatory hostile work environment.

121.     As a result of Defendants' unlawful retaliation in violation of FCRA, Plaintiff has suffered damages.

## COUNT VII
### Title VII, 42 U.S.C. § 2000e-2(a)(1)
### Sex Discrimination
### (Against all Defendants)

122.     Plaintiff reincorporates the allegations in paragraphs 45-57.

123.     Defendants discriminated against Plaintiff because of her sex.

124.     Plaintiff was a qualified individual because ProLogistix hired her, Plaintiff met ProLogistix's objective qualifications, and was never reprimanded for performance issues during her employment.

125.     Defendants treated Plaintiff less favorably than similarly situated employees, outside of her protected class.  Defendants required Plaintiff to clock out for the day when Plaintiff reported Ross for sexual harassment yet did not make Ross leave for the day.  Moreover, Defendants' terminated Plaintiff's employment, yet retained Ross even though their video footage corroborated Plaintiff's allegations against Ross after reviewing security footage. Rodriguez told Plaintiff, "We reviewed the tapes and saw Ross coming up to you all those times.  And that you never showed a picture to Demetrius."  When Plaintiff said, "OK, well then am I allowed to come back to work?"  Rodriguez said, "Unfortunately, you are not allowed to come back here."

126.    Plaintiff said, "Why are you sending me home?  I didn't do anything.  Bobby's the cause of all this.  What am I supposed to do?   I come all the way from Miami, I get sexually harassed, try to do something about it and now you're sending me home?"

127.    Hence, Defendants treated Plaintiff less favorably than similarly situated ProLogistix employees to the extent Defendants suspended Plaintiff pursuant to a policy for pending investigations.   Ultimately, Defendants retained Ross's employment yet terminated Plaintiff.

128.    Taken together, these allegations give rise to the reasonable inference that Defendants treated Plaintiff less favorably than similarly situated employees outside of her protected class.

129.    As a result of Defendants' intentional discrimination in violation of Title VII, Plaintiff has suffered damages.

**COUNT VIII**
**FCRA § 760.10(1)(a)**
**Sex Discrimination**
**(<u>Against all Defendants</u>)**

130.    Plaintiff reincorporates the allegations contained in paragraphs 45-47.

131.    Defendants discriminated against Plaintiff because of her sex.

132.    Plaintiff was a qualified individual because ProLogistix hired her, Plaintiff met ProLogistix's objective qualifications, and was never reprimanded for performance issues during her employment.

133.    Defendants treated Plaintiff less favorably than similarly situated employees, outside of her protected class.  Defendants required Plaintiff to clock out for the day when Plaintiff reported Ross for sexual harassment yet did not make Ross leave for the day.   Moreover, Defendants' terminated Plaintiff's employment, yet retained Ross even though their video footage

corroborated Plaintiff's allegations against Ross after reviewing security footage. Rodriguez told Plaintiff, "We reviewed the tapes and saw Ross coming up to you all those times. And that you never showed a picture to Demetrius." When Plaintiff said, "OK, well then am I allowed to come back to work?" Rodriguez said, "Unfortunately, you are not allowed to come back here."

134. Plaintiff said, "Why are you sending me home? I didn't do anything. Bobby's the cause of all this. What am I supposed to do? I come all the way from Miami, I get sexually harassed, try to do something about it and now you're sending me home?"

135. Hence, Defendants treated Plaintiff less favorably than similarly situated ProLogistix employees to the extent Defendants suspended Plaintiff pursuant to a policy for pending investigations. Ultimately, Defendants retained Ross's employment yet terminated Plaintiff.

136. Taken together, these allegations give rise to the reasonable inference that Defendants treated Plaintiff less favorably than similarly situated employees outside of her protected class.

137. As a result of Defendants' intentional discrimination in violation of the FCRA, Plaintiff has suffered damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment against Defendants, respectively:

A. As against Defendants, pursuant to FCRA § 760.11(5), Title VII § 102(b)(3), an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

B.      As against Defendants, pursuant to FCRA § 760.11(5) and Title VII § 102(b)(3), an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses

C.      As against Defendants, pursuant to FCRA § 760.11(5) and Title VII § 102(b)(3),an award of punitive damages for damages arising from the Company's discriminatory employment practices, with malice or with reckless indifference to Plaintiff's rights.

D.      As against Defendants, pursuant to FCRA § 760.11(5) and Title VII § 103, an award of costs that Plaintiff has incurred in this Action, as well as Plaintiff's reasonable attorneys' fees plus interest to the fullest extent permitted by law;

E.      Such other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991.


Dated: March 18, 2022


Respectfully submitted,


*/s/ Brett D. Kaplan*
Brett D. Kaplan, Esq.
Florida Bar No. 1031866
brett@dereksmithlaw.com
**DEREK SMITH LAW GROUP, PLLC**
701 Brickell Ave., Suite 1310
Miami, Florida 33131
Telephone: (305) 946-1884
Facsimile: (305) 503-6741
*Attorneys for Plaintiff Gala Melton*